**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| FELICIA MARTI, derivatively on behalf of PEABODY ENERGY CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>JAMES C. GRECH, MARK A. SPURBECK, MARC E. HATHHORN, M. KATHERINE BANKS, ANDREA E. BERTONE, WILLIAM H. CHAMPION, NICHOLAS J. CHIREKOS, STEPHEN E. GORMAN, JOE W. LAYMON, and ROBERT A. MALONE,<br><br>Defendants,<br><br>and<br><br>PEABODY ENERGY CORPORATION,<br><br>Nominal Defendant. | Case No.: |

**VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Felicia Marti ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Peabody Energy Corporation ("Peabody" or the "Company"), file this Verified Shareholder Derivative Complaint against James C. Grech ("Grech"), Mark A. Spurbeck ("Spurbeck"), Marc E. Hathhorn ("Hathhorn"), M. Katherine Banks ("Banks"), Andrea E. Bertone ("Bertone"), William H. Champion ("Champion"), Nicholas J. Chirekos ("Chirekos"), Stephen E. Gorman ("Gorman"), Joe W. Laymon ("Laymon"), and Robert A. Malone ("Malone") (collectively, the "Individual Defendants," and together with Peabody, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Peabody, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for violations of Sections 10(b), 20(a), and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution

against Defendants Grech, Spurbeck, and Hathhorn under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Peabody, legal filings, news reports, securities analysts' reports and advisories about the Company, filings in the securities class action captioned *McGeachy v. Peabody Energy Corporation, et al.*, Case No. 4:26-CV-01020 (E.D. Mo.) (the "Securities Class Action"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Peabody's current and former directors and officers from October 14, 2024 through May 4, 2026, both dates inclusive (the "Relevant Period").

2. Peabody is a Missouri-based company which owns and operates numerous coal mining operations throughout the United States and Australia. The Company produces coal for use in energy production as well as manufacturing processes. As such, the Company's primary customer base consists of utility and industrial organizations, namely electrical and steel-making companies.

3. The Company generates coal sales through a combination of long-term and short-term supply agreements. Long-term supply agreements feature a minimum duration of one year

and comprise the vast majority of the Company's revenue. In addition, the Company's five largest customers constituted roughly 25% of the Company's total revenue from coal supply agreements.

4. The Company also performs continuous asset optimization for its operations. The Company's asset optimization involves the review of a particular mine's commercial opportunities, such as the presence of rare earth elements and other critical minerals.

5. Among Peabody's more notable projects is its Centurion Mine (the "Centurion Mine"), located in Mackay, Queensland, Australia. Previously known as the "North Goonyella Mine," the Centurion Mine is intended to produce coal for use in manufacturing processes and was acquired by the Company in April 2004. In 2023, the Company acquired properties adjacent to the Centurion Mine, to expand the project. The Centurion Mine resumed production under Peabody's control in February 2026.

6. Throughout the Relevant Period, the Individual Defendants caused Peabody to make false and misleading statements about the Company's supposed efforts to ramp-up production at the Centurion Mine, and the Company's financial guidance associated with the Centurion Mine.

7. For example, on October 14, 2024, the first day of the Relevant Period, the Company hosted a special call to discuss its development plans for the Centurion Mine (the "October 2024 Special Call"). During the October 2024 Special Call, Defendant Hathhorn asserted that "[***w***]***e continue to advance on time and on budget towards full-scale long-haul production in March 2026.***"[1]

8. However, the Individual Defendants' statements concerning the Company's efforts to ramp-up production at the Centurion Mine were materially false. While the Individual

[1] Unless otherwise stated, all emphasis is added.

Defendants conveyed to investors that the ramp-up efforts would be completed by March 2026, they failed to disclose that the Centurion Mine faced numerous issues which hindered its expansion.

9. The truth began to emerge on March 30, 2026, when the Company filed a "Regulation FD Disclosure" with the SEC to report the lowering of the Company's guidance as it pertained to the Century Mine's first quarter 2026 production levels (the "March 2026 FD Disclosure"). The March 2026 FD Disclosure disclosed "that sales volume from the Centurion [M]ine is expected to be below prior expectations for the first quarter of 2026."

10. On this news, the price per share of Peabody stock fell $3.82, or 9.7%, from closing at a price of $39.50 per share on March 27, 2025, to close at a price of $35.68 per share on March 30, 2025.

11. The truth finally emerged on May 5, 2026, when the Company issued a press release to announce its financial results for the first quarter of 2026 (the "Q1 2026 Press Release"). The Q1 2026 Press Release noted that the Company "extended the Centurion [Mine] commissioning period, due to temporary equipment and roof control challenges."

12. That same day, the Company hosted an earnings call to discuss its financial results for the first quarter of 2026 with investors and analysts (the "Q1 2026 Earnings Call"). During the Q1 2026 Earnings Call, Defendant Grech stated that the Company "encountered temporary mechanical and electrical issues[] . . . as part of [the Centurion Mine's] commissioning of equipment in February." Further, during the Q1 2026 Earnings Call, Defendant Grech reported that the issues associated with the Centurion Mine "has required a long-than-anticipated commissioning period."

13. On this news, the price per share of Peabody stock fell $1.52, or approximately 5.7%, from closing at a price of $26.52 per share on May 4, 2026, to close at a price of $25.00 per share on May 5, 2026.

14. Throughout the Relevant Period, in breach of their fiduciary duties owed to Peabody, the Individual Defendants willfully or recklessly caused the Company to make materially false and/or misleading statements that failed to disclose, *inter alia*, that: (1) the Company's efforts to ramp-up production in the Centurion Mine faced numerous obstacles; (2) the obstacles facing the Company's efforts to ramp-up production in the Centurion Mine included mechanical and electrical issues; (3) as a result of the obstacles facing the Company's efforts to ramp-up production in the Centurion Mine, the Company would not be able to maintain the timeline for the Centurion Mine's ramp up; (4) the Centurion Mine would not be able to meet its previously expected production output; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

15. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

16. In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Peabody to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between October 2024 and April 2026, approximately 106,087 shares of Peabody common stock were repurchased at artificially inflated prices, costing the Company approximately $3.4 million. As the Company's stock was actually worth only $25.00 per share, the price at which it was trading when markets closed on May 5,

2026, after the corrective disclosures, the Company overpaid for repurchases of its own stock by approximately $717,000 in total.

17. Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls while one of the Individual Defendants engaged in improper insider sales, netting total proceeds of approximately $1.4 million.

18. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

19. In light of the Individual Defendants' misconduct—which has subjected the Company, its President/Chief Executive Officer ("CEO"), its Executive Vice President ("EVP") and Chief Financial Officer ("CFO"), and its former President of Global Operations to the Securities Class Action, and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

20. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendant Grech's, Defendant Spurbeck's, and Defendant Hathhorn's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand

to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)) and Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder by the SEC, Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R.§240.10b-5), Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

22. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

23. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

24. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

25. Plaintiff is a current shareholder of Peabody. Plaintiff has continuously held shares of Peabody common stock at all relevant times.

**Nominal Defendant Peabody**

26. Peabody is a Delaware corporation with principal executive offices at 1245 J.J. Kelley Memorial Drive, Suite 700, St Louis, Missouri 63131. Peabody common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "BTU."

**Defendant Grech**

27. Defendant Grech has served as the Company's President, CEO, and as a Company director since June 2021.

28. The proxy statement that the Company filed with the SEC on March 26, 2026 (the "2026 Proxy Statement") stated the following about Defendant Grech:

> James C. Grech was named Peabody President and Chief Executive Officer in June 2021. Mr. Grech has over 30 years experience in the natural resources industry. Most recently, Mr. Grech served as CEO and a member of the Board of Directors of Wolverine Fuels, LLC, a thermal coal producer and marketer based in Sandy, Utah, from July 2018 to May 2021. Prior to joining Wolverine Fuels, LLC, Mr. Grech served as President of Nexus Gas Transmission from October 2016 to July 2018 and previously held the position of Chief Commercial Officer and Executive Vice President of Consol Energy. He serves as a director of Blue Danube Incorporated, a privately held shipping company.
>
> Mr. Grech's strong operational, commercial and financial background in both mining and other energy business operations complements the Board's existing mix of skills. His extensive utilities, capital markets, risk management and executive experience offers the Board insight into the Company's operations from an executive point of view.
>
> Mr. Grech holds a Bachelor of Science in Electrical Engineering from Lawrence Technological University and a Master of Business Administration from the University of Michigan.

**Defendant Spurbeck**

29. Defendant Spurbeck has served as the Company's EVP and CFO since June 11, 2020. Previously, Defendant Spurbeck served as the Company's Interim CFO from January 6, 2020 to June 11, 2020. Defendant Spurbeck also served as the Company's Chief Accounting

Officer from March 2018 to June 11, 2020, and continues to serve as the Company's principal financial officer and principal accounting officer in his capacity as CFO. Defendant Spurbeck also served as the Company's Senior Vice President from March 2018 to June 11, 2020.

30. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Spurbeck made the following sale of Company common stock:

| **Date** | **Number of Shares** | **Avg. Price/ Share T** | **Proceeds** |
|---|---|---|---|
| November 6, 2024 | 10,000 | $29.52 | $295,200 |
| March 4, 2026 | 30,000 | $35.58 | $1,067,400 |

Thus, in total, before the fraud was exposed, Defendant Spurbeck sold 40,000 shares of Company stock on inside information, for which he received approximately $1.4 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

31. The Company's website[2] stated the following about Defendant Spurbeck:

> Mark Spurbeck is Executive Vice President and Chief Financial Officer for Peabody. He oversees finance, treasury, tax, internal audit, financial reporting, financial planning, risk and mine finance, corporate accounting functions, investor relations and corporate communications, information technology and shared services.
>
> Mr. Spurbeck joined Peabody in 2018, and most recently served as Senior Vice President & Chief Accounting Officer. Prior to joining Peabody, he served as the Vice President & Chief Accounting Officer of Coeur Mining, a diversified precious metals producer, where he led the accounting, finance and tax teams for five years. Previously, Mr. Spurbeck served at Newmont Mining for eight years in various

[2] *Corporate Governance*, PEABODY (Last Visited Sept. 1, 2026), https://www.peabodyenergy.com/Investor-Info/Corporate-Governance/Leadership-Team#tab_20.

> finance and accounting roles as well as First Data Corporation. He began his career at Deloitte LLP.
>
> Mr. Spurbeck holds a Bachelor of Arts degree in Accounting from Hillsdale College and is a Certified Public Accountant (inactive).

**<u>Defendant Hathhorn</u>**

32. Defendant Hathhorn served as the Company's President of Global Operations from June 2024 to October 31, 2024.

**<u>Defendant Banks</u>**

33. Defendant Banks has served as a Company director since October 16, 2023. Defendant Banks currently serves as a member of the Audit Committee and as a member of the Health, Safety, Security & Environmental Committee (the "HSSE Committee").

34. The 2026 Proxy Statement stated the following about Defendant Banks:

> Dr. M. Katherine Banks has over 40 years of experience in engineering, technology and academia. Dr. Banks served as President of Texas A&M University and Vice Chancellor of National Laboratories for the Texas A&M University System from June 2021 to July 2023. Prior to her appointment as President, she served as Vice Chancellor and Dean of Engineering at Texas A&M University from January 2012 to June 2021. She has held numerous leadership positions in engineering schools, including serving as Department Head of Civil Engineering at Purdue University. Dr. Banks is an Elected Fellow of the American Society of Civil Engineers and was elected to the National Academy of Engineering in 2014. Dr. Banks also currently serves as an independent director of Halliburton Company.
>
> Dr. Banks brings to the Peabody Board deep experience in leading large organizations with diverse employee populations. The Board also values her technical expertise- particularly as it relates to environmental issues that the Board addresses-and experience leading interactions with Federal government agencies.
>
> Dr. Banks holds a bachelor's degree in engineering from the University of Florida, master's degree in engineering form the University of North Carolina, and a doctoral degree in civil and environmental engineering from Duke University.

**<u>Defendant Bertone</u>**

35. Defendant Bertone has served as a Company director since February 21, 2019. Defendant Bertone currently serves as the Chair of the HSSE Committee, as a member of the Audit Committee, and as a member of the Executive Committee.

36. The 2026 Proxy Statement stated the following about Defendant Bertone:

> Andrea E. Bertone is an experienced leader of large, listed businesses, having held both executive and nonexecutive roles at international energy companies. She has a deep understanding of U.S. and global markets and their underpinning regulation.
>
> Ms. Bertone is the former President of Duke Energy's international division, a position she held from 2009 until her retirement in 2016. She spent 15 years at Duke Energy, with executive responsibility for hydro and thermal assets across countries in Latin America. Prior to her role as President, Ms. Bertone held senior executive legal positions at Duke, including as associate General Counsel between 2003 and 2009. Ms. Bertone also served as Latin America counsel with Baker McKenzie. Ms. Bertone has non-executive director appointments at Waste Connections, Inc. and Drax pie. Andrea was also previously a non-executive director at DMC Global Inc., Yamana Gold Inc and Amcor pie. Ms. Bertone has dedicated her career to successfully leading international teams with diverse cultures and backgrounds, including in challenging circumstances.
>
> Ms. Bertone earned a Bachelor of Law from the University of Sao Paulo Law School in Brazil and a Master of Law in International and Comparative Law from Chicago-Kent College of Law at the Illinois Institute of Technology. She completed a finance program for senior executives at Haivard Business School. She is a member of the Brazilian Bar Association

**Defendant Champion**

37. Defendant Champion has served as a Company director since July 15, 2020. Defendant Champion currently serves as a member of the Compensation Committee and as a member of the HSSE Committee.

38. The 2026 Proxy Statement stated the following about Defendant Champion:

> William H. Champion served as Principal of Gladiator Mining Group, LLC from 2014 until his retirement in 2017. From 2002 to 2014, he served in a number of executive management roles for Rio Tinto PLC in its coal, diamond and copper segments, including as Managing Director of Rio Tinto's former Australian coal assets. Mr. Champion's deep knowledge of the mining industry- in particular, his direct management of coal assets in Australia, as well as his experience with other

> mineral and metal commodities- is important to the Board's oversight of the Company's operational and safety efforts, both in the United States and in Australia. Mr. Champion's experience is also beneficial to the work the Board does in respect to its risk oversight and governance oversight functions.
>
> Mr. Champion is currently an independent director of Buenaventura Mining Co. Inc., Peru's largest publicly traded precious and base metals company. He also previously served on the board of PJSC Polyus Gold, a Russian mining company, until 2022.
>
> Mr. Champion earned a pair of Bachelor of Science degrees in Chemical Engineering and Biological Sciences from the University of Arizona. He also attended the W.P. Carey School of Business Executive MBA Program at Arizona State University.

**<u>Defendant Chirekos</u>**

39. Defendant Chirekos has served as a Company director since April 3, 2017. Defendant Chirekos currently serves as the Chair of the Audit Committee, as a member of the Executive Committee, and as a member of the Nominating & Corporate Governance Committee.

40. The 2026 Proxy Statement stated the following about Defendant Chirekos:

> Nicholas J. Chirekos served in various investment banking roles at J.P. Morgan Securities Inc. from 1987 until his retirement in 2016. He was most recently the Managing Director, North America Head of Mining from 2002 to 2016. Prior to that, he served as the Global Head of Mining and Metals. Mr. Chirekos serves on the Board of Directors for Metallus Inc. (Audit Committee member), as well as the Executive Advisory Board at the University of Denver's Daniels College of Business. He previously served on the board of New Gold Inc. from 2019 to 2026.
>
> Mr. Chirekos' extensive experience in investment banking roles, including significant experience within the mining sector, provides the Board with critical, industry-specific financial expertise. Mr. Chirekos' work with both North American companies as well as companies with global operations offers significant international insight into the Board's decision-making process. He also has significant mergers and acquisitions experience and capital markets expertise.
>
> Mr. Chirekos earned a Bachelor of Science from the University of Denver and Masters of Business Administration from New York University.

**<u>Defendant Gorman</u>**

41. Defendant Gorman has served as a Company director since April 3, 2017. Defendant Gorman currently serves as the Chair of the Nominating & Corporate Governance Committee, as a member of the Compensation Committee, and as a member of the Executive Committee.

42. The 2026 Proxy Statement stated the following about Defendant Gorman:

> Stephen E. Gorman retired as Chief Executive Officer of Air Methods Corporation in 2020. Prior to that he served as the President and Chief Executive Officer of Borden Dairy Company from 2014 to July 2017. Prior to joining Borden Dairy Company, he was with Delta Air Lines, Inc. from 2007 to 2014, where he was the Chief Operating Officer. From 2003 to 2007, Mr. Gorman served as the President and Chief Executive Officer of Greyhound Lines, Inc. Mr. Gorman was also the Executive Vice President, Operations Support and President, North America for Krispy Kreme Doughnuts, Inc. from 2001 -2003. He currently serves on the board of FedEx Corporation ("FedEx") and previously served on the board of ArcBest Corporation from July 2015 to August 2022. FedEx has announced that Mr. Gorman will resign from the board of FedEx Corporation effective upon his joining the board of directors of FedEx Freight upon the planned spin-off of FedEx Freight by FedEx Corporation (which is expected to occur in June 2026).
>
> Mr. Gorman brings to our Board extensive leadership experience from his roles as chief executive officer of three companies, and his operations experience as a senior executive of several companies, including companies with global operations, provides valuable insight to the Board on questions of operations and safety oversight. His prior executive experience also offered him experience with both mergers and acquisitions as well as financial matters.
>
> Mr. Gorman earned a Bachelor of Science from Eureka College and a Master of Business Administration from Bradley University.

**Defendant Laymon**

43. Defendant Laymon served as a Company director from April 3, 2017 to May 20, 2026.

44. The 2026 Proxy Statement stated the following about Defendant Laymon:

> Joe W. Laymon served as Vice President, Human Resources and Corporate Services for Chevron Corporation from 2008 until his retirement in 2017. Prior to joining Chevron Corporation, Mr. Laymon worked at Ford Motor Company from 2000 to 2008, where he was the Vice President, Human Resources and later the

> Group Vice President, Corporate Human Resources and Labor Affairs. He also served as the Vice President, Human Resources, U.S. and Canada Region for Eastman Kodak Company from 1996 to 2000. He currently serves as a director of Clearwater Paper Corporation (Compensation and Nomination & Governance Committee member), the Piston Group (Chair of the Compensation Committee), and Detroit Thermal Systems. Mr. Laymon also owns JWL Consulting LLC and co-owns VJ Enterprises LLC.
>
> Mr. Laymon brings to our Board deep understanding of and experience in executive compensation and human capital issues, which he brings to bear in his role as the Chairman of the Board's Compensation Committee. His work experiences also allow Mr. Laymon to provide key insight to the Board's oversight efforts on issues of leadership, corporate governance, labor relations and regulatory affairs.
>
> Mr. Laymon earned a Bachelor of Science in Economics from Jackson State University and a Master of Economics from the University of Wisconsin.

**Defendant Malone**

45. Defendant Malone has served as a Company director since 2009. Defendant Malone currently serves as the Chair of the Executive Committee.

46. The 2026 Proxy Statement stated the following about Defendant Malone:

> Bob Malone was elected Executive Chairman, President and Chief Executive Officer of First Sonora Bancshares, Inc., a privately-held bank holding company, in 2014. He also serves as Chairman, President and Chief Executive Officer of the First National Bank of Sonora, Texas (dba Sonora Bank), a community bank owned by First Sonora Banchares, Inc., a position he has held since 2014. He joined First Sonora Banchares and Sonora Bank in October 2009 as President and Chief Executive Officer. He is a retired Executive Vice President of BP pie and the retired Chairman of the Board and President of BP America Inc., at the time the largest producer of oil and natural gas and the second largest gasoline retailer in the United States. He served in that position from 2006 to 2009. He currently serves as a director of Teledyne Technologies Incorporated and Halliburton Company.
>
> Mr. Malone's previous leadership experience, especially his experience as board chairman, is invaluable to the Board's ability to function at a high level and to follow good governance practices. His knowledge of the energy industry is also particularly deep, which adds to the Board's expertise as it fills its oversight role with respect to safety, risk management and compliance matters.

Mr. Malone holds a Bachelor of Science in Metallurgical Engineering from The University of Texas at El Paso and a Master of Science in Management from Massachusetts Institute of Technology.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

47. By reason of their positions as officers, directors, and/or fiduciaries of Peabody and because of their ability to control the business and corporate affairs of Peabody, the Individual Defendants owed Peabody and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Peabody in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Peabody and its shareholders so as to benefit all shareholders equally.

48. Each director, and officer of the Company owes to Peabody and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

49. The Individual Defendants, because of their positions of control and authority as directors, and/or officers of Peabody, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

50. To discharge their duties, the officers, and directors of Peabody were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

51. Each Individual Defendant, by virtue of his or her position as a director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable

violation of their obligations as directors, and officers of Peabody, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Peabody's Board at all relevant times.

52. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

53. To discharge their duties, the officers, and directors of Peabody were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers, and directors of Peabody were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Missouri, and the United States,

and pursuant to Peabody's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Peabody conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Peabody and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Peabody's operations would comply with all applicable laws and Peabody's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

54. Each of the Individual Defendants further owed to Peabody and the shareholders the duty of loyalty requiring that each favor Peabody's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

55. At all times relevant hereto, the Individual Defendants were the agents of each other and of Peabody and were at all times acting within the course and scope of such agency.

56. Because of their advisory, executive, managerial, directorial, and controlling positions with Peabody, each of the Individual Defendants had access to adverse, non-public information about the Company.

57. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Peabody.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

58. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

59. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, the aiding and abetting thereof, unjust

enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

60. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Peabody was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

61. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

62. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Peabody and was at all times acting within the course and scope of such agency.

## PEABODY'S CODE OF CONDUCT

63. The Company's Code of Conduct "defines ethical standards to help all of us achieve the objective of establishing and maintaining a reputation as a world-class company." The Code of Conduct notes that "[i]t applies to all directors, officers and employees of Peabody Energy Corporation, its subsidiaries and affiliates[.]"

64. In a section titled "Conflicts of Interest," the Code of Conduct states the following, in relevant part:

> We must avoid all conflicts of interest and appearance of impropriety when representing Peabody in business dealings or in making any recommendation which could affect Peabody. Actual or apparent conflicts of interest must be disclosed in writing to your supervisor and a promptly submitted as a conflict disclosure through our online process. Ethical decision-making is essential to our success. Some decisions are obvious and easy to make; others are not. Your supervisor should consult with our Legal Department on how best to address any apparent or actual conflict of interest.
>
> A "conflict of interest" exists if our private interest interferes, or appears to interfere, with the interests of Peabody. A conflict can arise if we take actions or have interests that may make it difficult to perform our work objectively and effectively. Conflicts of interest may also arise when we, or members of our families, receive improper personal benefits as a result of positions with us. Loans to, or guarantees of obligations of, executive officers and their family members by Peabody are not permitted by law.

65. In a section titled "Compliance with All Laws," the Code of Conduct states the following, in relevant part:

> Peabody complies in all respects with the laws and regulations that apply to our business at all government levels (including tribal or indigenous group governments). We are expected to comply with the letter and spirit of such laws and regulations.
>
> If a law conflicts with a policy or something in this Code, we must comply with the law; however, if a local custom or policy conflicts with this Code, we must comply with this Code. Talk with the Legal Department for specific advice about requirements or prohibitions or ask a question through the Tell Peabody system.

66. In the section titled "Compliance with All Laws," under the subheading "Securities Laws and Insider Trading," the Code of Conduct states the following, in relevant part:

> Peabody is a publicly owned corporation with stock traded on the New York Stock Exchange in the United States. Our policy requires that we obey all securities laws.
>
> It is a violation of applicable securities laws for any of us to use for our own benefit, or to selectively disclose to others for their benefit, "material" non-public information about our plans or operations. Non-public information is "material" if a reasonable investor would find it important in deciding to buy or sell shares of a company's stock. All non-public information about our plans and operations, whether or not "material," is our absolute property. As a result, it is a violation of this Code to use any non-public information for our own benefit, or to disclose it to any party outside Peabody except as authorized or required by applicable laws or regulations.

67. In a section titled "Financial Reporting and Record-Keeping," under the subheading "Financial Reporting," the Code of Conduct states the following:

> We are committed to providing meaningful financial reports and other material information about our operations to our shareholders on a regular basis. In furtherance of this commitment, we will produce clear, timely and accurate financial statements and public reports that fully comply with all laws and regulations and that fairly present in all material respects our financial condition, results of operations and cash flows for the periods presented. All financial statements filed with the U.S. Securities and Exchange Commission (SEC) will be prepared on a consistent basis of accounting and in accordance with U.S. Generally Accepted Accounting Principles (GAAP). In addition, we will strive to make clear and concise disclosures that adhere to the SEC's "plain English" principles.
>
> We will endeavor to implement the necessary systems, procedures and controls to ensure that this policy is strictly adhered to. We are committed to establishing and maintaining an effective system of internal control over financial reporting that is properly documented and monitored for effectiveness. Our monitoring procedures include, but are not limited to, a multi-discipline "Disclosure Committee" that reviews our earnings releases, financial statements and certain SEC filings. We also conduct a comprehensive internal certification process designed to identify issues throughout Peabody that might impact external reporting. These processes are designed (i) to assure that disclosure and internal control issues are identified and results are verified at multiple levels, and (ii) to provide necessary due diligence to support all required Chief Executive Officer and Chief Financial Officer certifications; with the overall goal of ensuring that our public reports contain clear, accurate and complete financial disclosures that comply with all applicable laws and regulations.

68. In a section titled "Financial Reporting and Record-Keeping," under the subheading "Proper Recording of Funds and Assets," the Code of Conduct states the following:

> Accurate record-keeping is essential to meeting our financial reporting objectives and is required by law. All of our funds, assets, commitments, receipts and disbursements shall be properly and consistently recorded on our books in compliance with all applicable legal requirements, GAAP or other applicable accounting standards and our system of accounting and internal control over financial reporting. This includes funds received from the sale or disposal of any assets. No unrecorded funds or assets of any kind are to be maintained by any Peabody employee, subsidiary or affiliate.
>
> Specifically, we understand that:
>
> > • *No funds, assets or accounts will be established or maintained for purposes which are not fully and accurately reflected on our books and records.*
> >
> > • *No funds or other assets will be received or disbursed without being fully and accurately reflected on our books and records.*
> >
> > • *No false or fictitious entries will be made on our books or records and no false or misleading reports pertaining to us or our operations will be issued.*
> >
> > • *If we become aware of unethical actions or instructions designed to increase financial gain, we each have an obligation to report these actions to Peabody without the fear of retaliation.*
>
> Immediately report any concerns about or knowledge of any act or circumstance prohibited to the Chief Financial Officer and the Chief Legal Officer, or using one of the resources identified in this Code such as our Tell Peabody helpline.
>
> (Emphasis in original).

69. In a section titled "Financial Reporting and Record-Keeping," under the subheading "Retention of Records and Communications," the Code of Conduct states the following:

> Our records, correspondence and communications are to be accurate, professional and self-documenting. Avoid exaggeration, derogatory remarks, guesswork, or inappropriate characterizations of people and companies that may be inaccurate or misunderstood. Apply these concepts equally to e-mail, internal memos and formal reports.
>
> Always retain or destroy records in accordance with our record retention policies. However, be aware that at times we may need to retain documents beyond the period they would normally be retained. The most common reasons are litigation

> or other legal matters. In these situations, retention and preservation of documents are critical. If you have documents that may be required for litigation or other legal matters, the Legal Department will place those documents on a "legal hold," meaning the documents cannot be altered, destroyed, deleted or modified in any manner, and will inform the individuals most closely identified with the documents of this legal hold. Instructions for retaining the documents will be provided, and you must ensure that these instructions are followed. A legal hold remains in effect until you are notified otherwise by the Legal Department in writing.

70. In a section titled "Reporting of Violations," the Code of Conduct states the following, in relevant part:

> Our business and reputation depends, in large measure, on being mindful of and adhering to the provisions of this Code. We are encouraged and obligated to report any known or suspected Code violations to our supervisors and the Chief Legal Officer. The integrity of our workplace rests on a strong speak up culture where everyone's help is valued and necessary. Except as qualified by the next sentence, no disciplinary action will be taken, and we will not tolerate any retaliation, against you for making such a report in good faith and all information provided will be maintained in the strictest confidence. The reporting of a violation by you that implicates you, either directly or indirectly, will not protect you from disciplinary action by us, including the possibility of dismissal for cause.
>
> Our Board of Directors has established procedures for receiving, retaining and investigating reported Code and policy violations. If we have any concern regarding questionable business practices, we need to raise it with our supervisor or human resources representative. If, based on the nature of the violation, this type of communication is not a viable option, contact our Tell Peabody hotline. You may call toll-free where *a phone* operator can be reached 24 hours a day, 7 days a week. Country specific numbers are available on our intranet site or by visiting TellPeabody.com. An online web report may also be submitted to TellPeabody.com. Also, emails may be sent to integrity@peabodyenergy.com and the Ethics and Compliance team will log the concern in Tell Peabody.com. The ***Tell Peabody*** *software system and telephone intake are* operated by an independent third party and designed to allow for confidential and anonymous communication of concerns.
>
> (Emphasis in original).

71. In a section titled "Waivers," the Code of Conduct states the following:

> Any change in or waiver of this Code for Peabody executive officers (including senior financial officers) or directors may be made only by our Board of Directors or a Board committee and will be promptly disclosed as required by law or stock exchange regulation.

72. In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Moreover, one of the Individual Defendants violated the Code of Conduct by engaging in insider trading, netting proceeds of approximately $1.4 million. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct.

**PEABODY'S AUDIT COMMITTEE CHARTER**

73. According to the Company's Audit Committee Charter (the "Audit Committee Charter"), the "purpose" of the Audit Committee is as follows:

> The Committee shall provide assistance to the Board of Directors in fulfilling its oversight responsibility to the stockholders, potential stockholders, the investment community, and others with respect to (i) the quality and integrity of the Company's financial statements and financial reporting processes, (ii) the Company's systems of internal accounting and financial controls and disclosure controls, (iii) the independent auditor's qualifications and independence, (iv) the performance of the Company's internal audit function and independent auditor, and (v) compliance with legal and regulatory requirements.

74. In the section titled "Statement of Responsibilities," under the subheading "Financial Statement and Disclosure Matters, the Audit Committee Charter states that the Audit Committee will:

> ➢ Review and discuss with management and the independent auditor the Company's quarterly financial statements (including disclosure in MD&A)

prior to the filing of the Company's Form 10-Q, including the results of the independent auditor's review of the quarterly financial statements.

➢ Review and discuss with management and the independent auditor the Company's annual audited financial statements (including the related notes, the form of audit opinion to be issued by the auditors on the financial statements and disclosure in MD&A) and recommend to the Board of Directors whether such audited financial statements should be included in the Company's Form 10-K.

➢ In connection with each periodic report of the Company, review and discuss with management and the independent auditor:

  ➢ Management's disclosure to the Committee under Section 302 of the Sarbanes- Oxley Act (the "Act"); and

  ➢ The contents of the certificates to be filed by the CEO/CFO under Section 302 and 906 of the Act.

➢ Discuss with management and the independent auditor any significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including:

  ➢ Significant changes in the Company's selection or application of accounting principles; and

  ➢ Major issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies and the adequacy of disclosure about changes in internal control over financial reporting.

➢ Discuss with management and the independent auditor any analyses prepared setting forth significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including analyses of the effects of alternative GAAP methods on the financial statements.

➢ Discuss any significant matters arising from any audit, including any audit problems or difficulties, whether raised by management, the internal auditing department or the independent auditor, relating to the Company's financial statements.

➢ Discuss with the independent auditor the matters, and any communications related to such matters, required to be discussed by applicable requirements of the Public Company Accounting Oversight Board (the "PCAOB") and the

Securities and Exchange Commission, and other applicable regulations, including any difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, any significant disagreements with management and management's response to these difficulties or disagreements.

- Review and discuss with management, the independent auditor and internal audit the Company's internal controls report and the independent auditor's attestation of the report prior to the filing of the Company's Form 10-K.

- Review and discuss with management and the independent auditor quarterly reports (if applicable) from the independent auditor on:

    - All critical accounting policies and practices to be used;

    - All critical audit matters proposed by the independent auditor to be included in the independent auditor's audit report;

    - Alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor; and

    - Other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.

- Discuss with management and the independent auditor the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements.

- Review the type and presentation of information to be included in earnings press releases (including the use of "pro forma", or "adjusted" non-GAAP, information) and discuss with management the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and ratings agencies. Such discussions may be general (consisting of discussing the types of information to be disclosed and the types of presentations to be made) and each instance in which the Company provides earnings guidance need not be discussed in advance.

- Discuss with management and the independent auditor:

    - The Company's guidelines and policies with respect to risk assessment and risk management; and

- ➢ The Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

75. In the section titled "Statement of Responsibilities," under the subheading "Oversight of Internal Audit Function," the Audit Committee Charter states that the Audit Committee will:

- ➢ Ensure that the Company maintains an internal audit function, and review the appointment and replacement of the Company's senior internal audit team and/or provider.

- ➢ Approve terms of engagement for internal audit team and/or provider.

- ➢ Review significant reports to management prepared by the internal audit function and management's responses.

- ➢ Discuss with the internal auditor, management and the independent auditor the overall scope and plans for the annual audit, including the adequacy of staffing and compensation.

- ➢ Discuss with the independent auditor and management the internal audit team responsibilities, and any recommended changes in the planned scope for the internal audit, including the adequacy of staffing and compensation.

- ➢ Hold separate executive session with internal auditor at least quarterly.

76. In the section titled "Statement of Responsibilities," under the subheading "Miscellaneous," the Audit Committee Charter states that the Audit Committee will:

- ➢ Consider and approve the election by the Company or any of its subsidiaries of (i) any exemption from any requirement to submit for clearing any swap arrangements with third party and affiliate counterparties and (ii) any exemption from the mandatory trade execution requirements for such swap arrangements.

- ➢ Review compliance with applicable laws and regulations and review and oversee the Company's policies, procedures and programs designed to promote and monitor legal and regulatory compliance.

- ➢ Review periodically, with the Company's counsel, any legal matter that could have a significant impact on the Company's financial statements or the Company's compliance policies and internal controls.

- ➢ Hold separate executive sessions with the Chief Financial Officer and Chief Administrative Officer and Corporate Secretary to inquire as to the existence of any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information, and as to the existence of any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

- ➢ Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters, in compliance with applicable laws and regulations.

- ➢ Review and discuss any reports concerning material violations submitted to the Committee by Company attorneys or outside counsel pursuant to the Commission's attorney professional responsibility rules or otherwise.

- ➢ Discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting or compliance policies.

- ➢ Confirm with the independent auditor the audit was conducted in accordance with Section 10A of the Exchange Act.

- ➢ Prepare the Committee report and any other disclosures required by the rules of the Commission to be included in the Company's annual proxy statement.

- ➢ Review the Committee charter at least annually and recommend any proposed changes for Board approval.

- ➢ Perform an annual review and evaluation of the Committee's performance and report the results of this review and evaluation to the Board.

- ➢ Consider qualifications of Audit Committee financial experts.

- ➢ Perform an annual review of the Company's aircraft usage for executive officers.

- ➢ Review and discuss such other matters that relate to the accounting, auditing and financial reporting practices and procedures of the Company as the Committee may, in its own discretion, deem desirable in connection with the review functions described above.

- Perform any other duties or responsibilities required by applicable laws, regulations and stock exchange rules, the Certificate of Incorporation or By-Laws of the Company or that are delegated to the Committee by the Board from time to time.

77. Defendants Chirekos (as Chair), Banks, and Bertone violated the Audit Committee Charter by engaging in or permitting the Company to engage in the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to oversee risks related to financial reporting, internal controls, and internal information systems, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures.

## <u>**THE INDIVIDUAL DEFENDANTS' MISCONDUCT**</u>

***Background***

78. Peabody is a Delaware corporation headquartered in St. Louis, Missouri, chiefly engaged in the coal industry. More specifically, the Company purports to be an industry leader in the production of metallurgical and thermal coal. To that end, Peabody owns interests in 16 active coal mining operations throughout the United States and Australia, as of December 31, 2025.

79. The Company's customers are primarily electricity generators, industrial facilities, and steel manufacturers. Thermal coal is utilized for electricity and heat generation, and as such is

primarily sold to electric and other utility companies.[3] Metallurgical coal is used as a raw material in various industrial processes such as steelmaking, and as such is generally sold to manufacturing-based companies.[4]

80. The Company's sales derive from: (1) long-term supply agreements consisting of initial terms of one year or longer; and (2) short-term supply agreements consisting of terms of under one year, namely agreements made on spot bases. The Company derives most of its sales through long-term supply agreements, which comprised roughly 87% of its sales in 2025. Moreover, Peabody generates approximately 25% of its total revenue from coal supply agreements with its five largest customers.

81. The Company's coal supplying agreements are further categorized according to two sets of operations: (1) Seaborne Thermal and Seaborne Metallurgical (collectively the "Seaborne Operations"); and (2) U.S. Thermal Operations. The Company's Seaborne Operations comprise coal production transported on cargo ships or other seaborne methods. The Company's Seaborne Operations constituted roughly 51% of the Company's total revenue from coal supply agreements in 2025. As noted above, production from the Company's Seaborne Operations is generally used for electricity and heat generation or for as a raw material in the steelmaking process.

82. The Company's U.S. Thermal Operations constituted roughly 49% of the Company's total revenue from coal supply agreements in 2025. The production from the Company's U.S. Thermal Operations is primarily sold to electric utility companies in the United States. The Company generally sells the coal it produces through the U.S. Thermal Operations at

---

[3] "*Coal*," MARTOOL, https://martool.com/markets/cargo/dry-bulk-cargo/coal.

[4] *Id.*

the mine, utilizing rail loops, barges, or trucks. Additionally, the Company's customers bear the transportation costs associated with coal purchases.

83. Among the Company's more notable operations is the Centurion Mine, located in Mackay, Queensland, Australia. The Centurion Mine is an underground metallurgical coal mine, which is intended to produce coal for the Company's Seaborne Operations. Longwall production refers to a method of mining coal whereby uniform panels of coal deposits are extracted in solid panels, broken up, and subsequently removed to the surface.[5]

84. The Company initiated development of the Centurion Mine, which was previously operated by the Company White Mining Ltd., in the third quarter of 2022. As of December 31, 2025, the Centurion Mine possessed a net book value of roughly $1 billion, comprised of the Centurion Mine's property, plant, equipment, and mine development assets. The Centurion Mine commenced full-scale longwall production in February 2026.

**<u>False and Misleading Statements</u>**

***October 14, 2024 Special Call***

85. On October 14, 2024, the Company hosted the October 2024 Special Call.

86. During the October 2024 Special Call, Defendant Hathhorn provided investors with an update as to the Company's progress in the Centurion Mine, stating the following, in relevant part:

> Thus far in the second half, we processed our first development coal through the preparation plant and expect the first coal shipment by the end of the quarter. We also expect to commission our third continuous miner in coming weeks to further accelerate our development activities. ***We continue to advance on time and on budget towards full-scale long-haul production in March 2026.***
>
> At Peabody, we strive for safety and excellence in every aspect of our operations. and this is driven by the world-class team we've assembled at Centurion.

[5] *Longwall Mining*, SCIENCEDIRECT, https://www.sciencedirect.com/topics/earth-and-planetary-sciences/longwall-mining.

Centurion's General Manager and our VP of Australia Underground operations, each have over 25 years of underground mining and major project development experience, bringing a wealth of knowledge and expertise to Centurion. Having the right management team and support team is the difference maker.

As we ramp up to full-scale longwall production, we continue to onboard operators and maintenance personnel to support underground development in preparation for longwall mining. With the new exciting world-class project like Centurion, the buzz in the region and targeted recruitment have allowed for all key positions to be filled and we continue to hire experienced miners to continue our development work ahead of schedule.

All required licenses and permits are in place for our longwall start in Centurion South District. Coal mining from Centurion North is approved by existing mining leases but will require an amendment to the existing environmental permit. These amendments are fairly routine exercise for our activities. We don't see any problems for that amendment.

Centurion has a large reserve of premier hard coking coal with approximately 140 million tonnes and a long mine life of over 25 years. With a coal seam in excess of 4 meters, the GM Seam is known for its geological stability, providing a consistent and continuous coal face that minimizes operational disruptions. The uniformity of the scene, combined with the state-of-the-art, fit-for-purpose longwall reduces the risks of operational variability. All of this allows for efficient mining and first quartile production costs.

* * *

***The continuous miner cuts and bolts if it's a minor bulk arrangement. It cuts in both simultaneously increasing productivity and safety for the operators. Centurion has one set of Caterpillar longwall mining equipment, which is currently being stored on the surface in that picture I referenced. Following the development of southern panels, the longwall will be transported underground and installed to commence production, as I stated before, in March of 2026.***

87. Also during the October 2024 Special Call, Defendant Spurbeck discussed the Centurion Mine's purported March 2026 production date, stating the following in relevant part:

As Mark mentioned, early underground development rates are ahead of schedule, and I'm pleased to say that capital costs remain on budget. As a reminder, Centurion benefits from $1 billion of existing infrastructure, resulting in comparably lower development capital for nearly 5 million tonne a year mine with 25-plus years of life. Consistent with our long-time estimate, we expect $489 million of capital investment to refurbish existing infrastructure and develop the southern panels

> ahead of longwall production in March 2026, of which $250 million has been spent to date.
>
> We expect $430 million of incremental development capital to reach the 120 million tonnes of reserves in the northern panels and begin longwall production.
>
> From a timing perspective, $130 million of that will be spent concurrent with the development of the southern panels, leaving approximately $300 million of remaining development capital over the initial 3 years of longwall mining in the South. After commencing longwall production in the North in 2029, annual sustaining capital is expected to be $60 million for the next 10 years.

88. Moreover, during the October 2024 Special Call, Defendant Hathhorn answered a question concerning Centurion in the following pertinent exchange:

> [Q: Karla Kimrey – Peabody Energy – VP of Investor Relations] Thank you. Mr. Hathhorn, I have a question for you, do you foresee any execution risk to get to the longwall operations in 2026.
>
> [A: Defendant Hathhorn] So it's coal mining there. Obviously, there's risk, but I feel good. And I feel good because we talked about it in the comments, equipment delivery can be risk, but we bought -- have that behind us and I say that because the third continuous miner unit is really close to showing up to site. And the fourth one is in sight. So that's becoming less of a risk to us getting all this development done and getting longwall going on March '26. So I feel good.
>
> I think one of the luxury when I talk about new equipment generically but being more specifically is we've got a brand-new conveyance system. And we've got diversification with multiple continuous miners. If there is some maintenance downtime on one times we can make it up. When the belt is down, if the belt is down, we don't have good availability there, that can be an issue for a coal mine, but brand new belt, state-of-the-art, it's performing well. And still pretty good.
>
> And I think we've got a solid team. We already went through a few areas, conditions wise, but the team didn't miss a beat in the safety of our people and more importantly, getting through it. So again, I feel very confident that -- and most partly by just the rates we're getting. We have some late equipment deliveries. The team is already making that up. Somebody say already made it up. And I just we're getting -- they're doing well. So I feel very confident that March 2026, will have the longwall getting.

89. The above statements in ¶¶85-88 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) the Company's efforts to ramp-up production in the Centurion

Mine faced numerous obstacles; (2) the obstacles facing the Company's efforts to ramp-up production in the Centurion Mine included mechanical and electrical issues; (3) as a result of the obstacles facing the Company's efforts to ramp-up production in the Centurion Mine, the Company would not be able to maintain the timeline for the Centurion Mine's ramp up; (4) the Centurion Mine would not be able to meet its previously expected production output; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

***March 27, 2025 Proxy Statement***

90. On March 27, 2025, the Company filed its annual Schedule 14A (the "2025 Proxy Statement") with the SEC. Defendants Grech, Banks, Bertone, Champion, Chirekos, Gorman, Laymon, and Malone solicited the 2025 Proxy Statement pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

91. The 2025 Proxy Statement called for Peabody shareholders to, *inter alia*: (1) re-elect Defendants Grech, Banks, Bertone, Champion, Chirekos, Gorman, Laymon, and Malone to the Board for a one year term; (2) approve, on an advisory basis, the compensation for the Company's named executive officers; and (3) ratify the appointment of Ernst & Young LLP as Peabody's independent registered public accounting firm for 2025.

92. Regarding the Board's risk oversight functions, the 2025 Proxy Statement stated the following, in relevant part:

> The Board oversees an enterprise-wide approach to risk management, designed to support the achievement of organizational objectives, including strategic objectives, to enhance long-term organizational performance and stockholder value. A fundamental part of risk management is not only understanding the risks we face, how those risks may evolve over time and what steps management is taking to manage and mitigate those risks, but also understanding what level of risk

> tolerance is appropriate for us. Management is responsible for the day-to-day management of the risks we face, while the Board, as a whole and through its committees, is responsible for the oversight of risk management.
>
> In its risk oversight role, the Board has the responsibility to satisfy itself that the risk management processes designed and implemented by management are adequate and functioning as designed. The Board regularly reviews information regarding marketing, operations, safety performance, trading, finance, business development, cybersecurity function and strategy, employee safety, sustainability and human capital objectives, policies and performance as well as the risks associated with each. In light of the evolving artificial intelligence landscape, in the past year the Board requested and received special briefings on risks associated with these developing technologies. In addition, the Board holds strategic planning sessions with management to discuss our strategies, key challenges and risks and opportunities. The full Board receives reports on our enterprise risk management initiatives on at least an annual basis and oversees the process of identifying and mitigating our material risks.
>
> ***
>
> While the Board is ultimately responsible for risk oversight, Board committees have been allocated responsibility for specific aspects of risk oversight. The Audit Committee assists the Board in fulfilling its oversight responsibilities with respect to risk management in the areas of financial reporting, internal controls, risk assessment and risk management. The Compensation Committee assists the Board in fulfilling its oversight responsibilities with respect to the risks arising from our compensation policies and programs and human capital matters. The Health, Safety, Security and Environmental Committee assists the Board in fulfilling its oversight responsibilities with respect to the risks associated with our health, safety, security and environmental and sustainability objectives, policies and performance. The Nominating and Corporate Governance Committee assists the Board in fulfilling its oversight responsibilities with respect to the risks associated with board organization, membership and structure, ethics and compliance, political contributions and lobbying expenditures, succession planning for our directors and executive officers and corporate governance.

93. Regarding Peabody's Corporate Governance, the 2025 Proxy Statement stated the following:

> Good corporate governance is a priority at Peabody. Our key governance practices are outlined in our Corporate Governance Guidelines, committee charters and Code of Business Conduct and Ethics. These documents can be found on our website (www.peabodyenergy.com) by clicking on "Investor," then "Governance Documents." Information on our website is not considered part of this Proxy Statement.

> The Nominating and Corporate Governance Committee is responsible for reviewing the Corporate Governance Guidelines from time to time and reporting and making recommendations to the Board concerning corporate governance matters. Each year, the Nominating and Corporate Governance Committee, with the assistance of outside experts, reviews our corporate governance practices, not only to ensure that they comply with applicable laws and NYSE listing requirements, but also to ensure that they continue to reflect what the Nominating and Corporate Governance Committee believes are best practices and to promote our best interests and the best interests of our stockholders.

94. Regarding Peabody's Code of Conduct, the 2025 Proxy Statement also stated the following:

> We have "adopted a code of ethics, the "Code of Business Conduct and Ethics," which can be found on our website (www.peabodyenergy.com) by clicking on "Investor" and then "Governance Documents." The Code of Business Conduct and Ethics applies to all our directors, officers and salaried employees. Information on our website is not considered part of this Proxy Statement.

95. The 2025 Proxy Statement was materially false and misleading because it failed to disclose that: (1) contrary to the 2025 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements to the investing public, and thus the Individual Defendants on the Board were breaching their fiduciary duties; and (2) the Individual Defendants on the Board who were breaching their fiduciary duties were improperly interested in their re-election to the Board to allow themselves to continue breaching their fiduciary duties to the Company.

96. The 2025 Proxy Statement also failed to disclose that: (1) the Company's efforts to ramp-up production in the Centurion Mine faced numerous obstacles; (2) the obstacles facing the Company's efforts to ramp-up production in the Centurion Mine included mechanical and electrical issues; (3) as a result of the obstacles facing the Company's efforts to ramp-up production in the Centurion Mine, the Company would not be able to maintain the timeline for the Centurion

Mine's ramp up; (4) the Centurion Mine would not be able to meet its previously expected production output; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

97. As a result of Defendants Grech, Banks, Bertone, Champion, Chirekos, Gorman, Laymon, and Malone causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Grech, Banks, Bertone, Champion, Chirekos, Gorman, Laymon, and Malone to the Board for a one year term, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve, on an advisory basis, the compensation for the Company's named executive officers; and (3) ratify the appointment of Ernst & Young LLP as Peabody's independent registered public accounting firm for 2025.

***July 31, 2025 Earnings Call***

98. On July 31, 2025, the Company hosted an earnings call to discuss its financial results for the second quarter of 2025 with investors and analysts (the "Q2 2025 Earnings Call").

99. During the Q2 2025 Earnings Call, Defendant Grech stated the following regarding the levels of activity in the Centurion Mine, in relevant part:

> Also of note, today, we announced an acceleration of longwall operations at our flagship premium hard coking coal mine, Centurion. We're now targeting longwall start-up in February 2026. This improved time line reflects strong execution across our operations team. By way of progress, we plan to start installing longwall shields in November. Workforce expansion remains a key focus, and we already have approximately 260 employees hired. Through an active recruitment process, we aim to reach a head count of around 400 by early 2026 to support full production. I'd be remiss if I didn't also speak of the strong tailwinds in the U.S. markets. Last quarter, the President signed executive orders to revitalize the U.S. coal industry and expand the use of coal fuel generation. And earlier this month, the One Big Beautiful Bill was passed. It delivers long overdue relief to American coal producers by reducing royalty burdens, streamlining permitting and restoring regulatory certainty, enabling the industry to compete, invest and power the nation with confidence.

***October 30, 2025 Earnings Call***

100. On October 30, 2025, the Company hosted an earnings call to discuss its financial results for the third quarter of 2025 with investors and analysts (the "Q3 2025 Earnings Call").

101. During the Q3 2025 Earnings Call, Defendant Grech stated the following regarding production at the Centurion Mine, in relevant part:

> Our third quarter was punctuated by strong thermal coal shipments and historically low met coal costs. Also, I'm delighted to say that the longwall production at our flagship Centurion mine begins next quarter.
>
> We expect shipments of Centurion's premium hard coking coal to expand sevenfold in 2026 to 3.5 million tons and even more beyond that time.
>
> Development and hiring remains on track and longwall equipment is beginning to be installed underground ahead of the February start.
>
> Over the 25-plus year mine life, we expect Centurion to be our lowest cost metallurgical coal mine. And by itself, the mine should boost our average met coal portfolio realizations as a percent of benchmark from the 70% mark this year to roughly 80% in 2026.

***February 5, 2026 Earnings Call***

102. On February 5, 2026, the Company hosted an earnings call to discuss its financial results for the fourth quarter and full year of 2025 with investors and analysts (the "Q4/FY 2025 Earnings Call").

103. During the Q4/FY 2025 Earnings Call, Defendant Grech provided another update as to the developments in the Centurion Mine, stating the following in relevant part:

> ***I'm pleased to announce that I was in Australia last week, where the team was installing the very last shield and putting the finishing touches on the Centurion mine in advance of starting longwall mining, well ahead of its original schedule.*** I have to say the culture that has been built at Centurion is outstanding, and our team has charged up and has started mining some of the best metallurgical coal in the world.

> Let me remind you of some of the extensive benefits Centurion has on the Peabody portfolio. First, Centurion is expected to ship an average of 4.7 million tons per year of premium hard coking coal in a world that we remain convinced is structurally short of that product over time. We expect the mine to deliver 3.5 million tons in 2026, ramping up to that 4.7 million mark by 2028.
>
> Second, Centurion's product is of the highest quality and coupled with proximity to key demand nodes in Asia, results in full benchmark pricing. Our realizations across our entire met coal segment are expected to increase from 70% of the recognized benchmark in 2025 to 80% this year. And as volumes ramp up to 4.7 million tons, we expect it will further exceed that 80%.
>
> Third, this mine is a long-lived asset. Combined with the Wards Well acquisition in 2024 that allows significant development to the north, Centurion accesses the coveted Goonyella Middle Seam and is expected to have a mine life of 25-plus years with an integrated mine plan of 140 million tonnes. Finally, we previously reported a net present value for the project of $1.6 billion with all-in cost of $105 per short ton in [ 2024 dollars ] at an average benchmark price of $210 per metric ton, a level we are already above today.
>
> Our latest assessment is that Centurion alone represents an NPV of $2.1 billion at $225 benchmark pricing. So top realizations with full benchmark pricing, low cost and a long mine life. Centurion is truly the cornerstone asset in our strategy to maximize long-term shareholder value and to intentionally reweight our portfolio toward higher-margin metallurgical coal. This event marks the culmination of years of disciplined strategic investment and have positions Centurion to deliver the scale, cost performance and premium product quality needed to meet the growing global demand for high-grade steelmaking coal.
>
> Also during the quarter, we continued to make good progress in our asset optimization activities. Here, our goal is straightforward. Our Peabody development division is tasked with evaluating our vast land and mineral holdings to maximize our long-term earnings and cash flow potential from these assets. Actions include our work to locate renewable projects and formerly mined lands, notably in the United States with R3 Renewables. We're also working on Australia at the Centurion mine, developing a gas power station to convert waste gas to electricity, starting at 5 megawatts and expanding to 20 megawatts.

104. Also during the Q4/FY 2025 Earnings Call, Defendant Spurbeck provided a breakdown of the Company's financial and operational results, stating the following in relevant part:

> Peabody ended the year with $575 million in cash and total liquidity above $900 million, reflecting disciplined capital deployment through the period of intense

development at Centurion and consistent cash generation despite lower than midcycle seaborne coal prices. We ended 2025 with another quarter of strong execution. For the full year, results met or exceeded original guidance for 7 of 8 volume and cost metrics. Seaborne thermal delivered 3.3 million tons, exceeding expectations. Realized export pricing averaged $81.80 per ton, up 7% from the third quarter. Costs came in below the low end of guidance and 12% lower quarter-over-quarter, supporting a robust 31% adjusted EBITDA margin and $63.5 million of fourth quarter EBITDA.

For the full year, the segment reported $222 million of adjusted EBITDA and total capital requirements were a mere $40 million. Costs were down over $3 per ton year-over-year, driven by disciplined cost management and higher production at the Wambo open cut. Seaborne met shipped 2.5 million tons, up $400,000 from the third quarter and above the fourth quarter target. Realized pricing began to improve and costs at $113 per ton were consistent with expectations. The segment delivered $24.6 million of adjusted EBITDA in Q4.

For the year, the segment generated $56 million of adjusted EBITDA. Shipments increased 1.3 million tons year-over-year to $8.6 million, but better yet, full year costs beat original guidance by more than $10 per ton. Peabody's Met segment will be further meaningfully improved with the start-up of Centurion, increasing volume to 10.8 million tons in 2026 and increasing segment-wide price realizations 10% versus the premium hard coking coal index. The U.S. thermal platform contributed $63 million of adjusted EBITDA in the fourth quarter. For the full year, the segment generated nearly $250 million of adjusted EBITDA against only $57 million of CapEx, demonstrating the consistent free cash flow generation capability of our reliable, low-cost U.S. thermal portfolio.

* * *

Looking ahead to 2026, I'll briefly review guidance for the full year. Seaborne thermal volumes are expected to be lower than 2025 due to the closure of the Wambo underground mine in Q3 last year and lower production at Wilpinjong due to reduced operating phases as the mine progresses into narrowing pits ahead of the Pit 9 and 10 extensions. Shipments are targeted at 12.5 million tons, including 8 million export tons. Costs are projected to be above 2025 levels at $50 per tonne on lower production. We anticipate a quality mix of 45% Newcastle and 55% higher ash product. Seaborne met volumes are projected to increase over 2 million tonnes to 10.8 million with the start of longwall production at Centurion. At the CMJV complex, we expect production to increasingly transition to the Coppabella mine as it completes the additional bench of pre-strip to improve high-wall stability in the third quarter of 2026 and Moorvale depletes its reserves.

Met coal costs are targeted at $113 per tonne, about $1 lower than last year. And we anticipate segment-wide average price realizations increasing to 80% of the premium hard coking coal index. For U.S. thermal, we expect a very similar year

> to 2025. In the PRB, we expect shipments between 82 million and 88 million tons and have 78 million tons priced at $13.40. Costs are expected to be consistent with 2025 levels at $11.50 per ton. Other U.S. thermal volumes are expected to be 13.7 million tons. We have 13.2 million tons priced at $54.40 and expect costs of $47 per ton, also in line with or better than 2025 results.
>
> Total capital expenditures are estimated at $340 million, $70 million lower than 2025 as Centurion begins longwall production. As we reflect on 2025, Peabody delivered a year marked by disciplined execution and strategic investment. Our balance sheet remains robust and provides sufficient flexibility through price cycles and the step change in met coal production reshapes our competitive position. We have invested approximately $750 million of organic cash flow to develop and expand Centurion, an investment that significantly enhances our leverage to premium hard coking coal markets and provides a cornerstone asset for the next 25 years. As a result, Peabody enters 2026 from a position of strength with an enhanced met platform, rapidly improving PLV benchmark prices, continued strong cash flowing thermal operations and overall supportive market conditions. Together, these factors position the company exceptionally well for the year ahead.

105. The above statements in ¶¶98-104 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) the Company's efforts to ramp-up production in the Centurion Mine faced numerous obstacles; (2) the obstacles facing the Company's efforts to ramp-up production in the Centurion Mine included mechanical and electrical issues; (3) as a result of the obstacles facing the Company's efforts to ramp-up production in the Centurion Mine, the Company would not be able to maintain the timeline for the Centurion Mine's ramp up; (4) the Centurion Mine would not be able to meet its previously expected production output; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

**<u>The Truth Emerges</u>**

***March 30, 2026 Regulation FD Disclosure***

106. The truth began to emerge on March 30, 2026, when the Company filed the March 2026 FD Disclosure.

107. More specifically, the March 2026 FD Disclosure stated the following, in relevant part:

> Based on recent events, Peabody Energy Corporation (the "*Company*" or "*Peabody*") has determined that sales volume from the Centurion Mine is expected to be below prior expectations for the first quarter of 2026. The mine is expected to deliver approximately 250,000 tons in the first quarter, based on greater-than-anticipated mine commissioning challenges.
>
> Full-year 2026 metallurgical coal volume targets remain unchanged at 10.3-11.3 million tons.
>
> The Company will report its full first quarter results on May 5, 2026.

(Emphasis in original).

108. On this news, the price per share of Peabody stock fell $3.82, or 9.7%, from closing at a price of $39.50 per share on March 27, 2025, to close at a price of $35.68 per share on March 30, 2025.

***May 5, 2026 Press Release and Earnings Call***

109. The truth fully emerged on May 5, 2026, when the Company issued the Q1 2026 Press Release. The Q1 2026 Press Release quoted Defendant Grech as stating the following, in relevant part:

> Amid volatility in global energy markets, our thermal segments benefited from strong demand and higher realized pricing. While we have extended the Centurion commissioning period, due to temporary equipment and roof control challenges, we continue to advance toward full longwall production rates. Our first quarter results demonstrate the value of our diverse global platform and reflect the durability of coal's role in providing reliable and affordable power.

110. That same day, the Company hosted the Q1 2026 Earnings Call. During the Q1 2026 Earnings Call, Defendant Grech discussed the Company's failure to ramp-up the Centurion Mine by March 2026, stating the following in relevant part:

> Focusing on our top priority, Centurion, I'll provide a thorough update of where we are today.

As you know, as part of our commissioning of equipment in February, we encountered temporary mechanical and electrical issues. While those challenges were resolved, the disruptions led to a slower cutting speed, which in turn contributed to roof control conditions. Maintaining roof integrity is critical to sustaining optimal cutting speeds. As a result, early in the ramp-up, progress was slower than we were anticipating even after resolution of the mechanical and electrical issues.

Importantly, once the mechanical and electrical issues were resolved, the team implemented a comprehensive response plan centered on proactive strata management and disciplined execution with safety as a top priority. We have brought together a highly experienced group of engineering and operational personnel from across the platform to address these challenges. Since that time, we have been systematically working through what was at its core an iterative cycle of slower equipment performance affecting roof conditions.

Over the past several weeks, we have taken deliberate steps to stabilize the operation by reinforcing the roof and face, realigning shields and improving overall cutting conditions. Naturally, every mine is unique with different geology, equipment and operating conditions, and it has taken some time to apply the right solutions at Centurion. While this has required a longer-than-anticipated commissioning period, it ensures that safety remains paramount as we work toward durable solutions.

Our safety performance has remained strong, and I want to be clear that we have had no carbon monoxide events, no methane issues, no ignition events and no regulatory challenges. While we are not yet at full cutting speed, the key remediation steps are largely in place, and we are encouraged by what we're seeing. We believe the remaining temporary headwinds are largely confined to the second quarter, with performance in the back half of 2026 expected to reflect a return to full longwall production rates.

We expect to sell roughly 300,000 tons in the second quarter, reflecting strong June production, but a traditional lag in converting production at the mine into sales at the port. Additionally, the 7-week longwall move that had been planned for the fourth quarter is now expected to shift into early 2027, which will support stronger production in the second half of this year. As a result, our full year sales outlook for Centurion is now 2.5 million tons compared to our original expectation of 3.5 million tons.

With that said, we've updated full year met segment volumes to reflect the 1 million ton decrease and increased cost to a range of $123 to $133 per ton. Stepping back, Centurion remains one of the most attractive assets in our portfolio with a strong position on realized pricing, cost, structure and mine life.

111. Moreover, during the Q1 2026 Earnings Call, Defendant Spurbeck provided an update as to the Company's financial and operational results for the first quarter of 2026, stating the following in relevant part:

> Realized export prices averaged $86.25 per ton, up more than 5% from the prior quarter, driven by higher Asian demand amid elevated LNG prices in the latter part of the quarter. Higher production from both Australian thermal mines helped reduce cost to $50.26 per ton, below the low end of guidance, resulting in a 25% adjusted EBITDA margin and $48.5 million of adjusted EBITDA. Seaborne metallurgical shipments totaled 2 million tons, 400,000 tons below plan due to the longwall ramp-up challenges at Centurion and unfavorably wet weather at the CMJV, partially offset by higher-than-anticipated production at Metropolitan, where we completed a longwall move ahead of schedule.
>
> Costs were higher than our guidance at $142 per ton, largely due to lower volumes at Centurion, partially offset by realized prices that increased 13% quarter-over-quarter. The segment recorded an adjusted EBITDA loss of $7 million as an otherwise strong quarter was reduced by $80 million from the Centurion ramp-up, including $10 million of additional commissioning costs. Our U.S. thermal business delivered $61.5 million of adjusted EBITDA in the first quarter. The PRB shipped 21.2 million tons, exceeding expectations.
>
> * * *
>
> We expect seaborne metallurgical volume of 2.3 million tons with realizations of 75% of the premium hard coking coal index. Costs are expected to continue at higher than full year run rates due to lower production at Centurion before achieving full longwall volume in the second half of the year. In the PRB, we anticipate shipments of 19 million tons at cost of $13.25, reflecting the traditional second quarter shoulder season and the $0.50 adjustment to higher fuel costs. Other U.S. thermal coal shipments are expected to increase to 3.4 million tons with costs at $45 to $49 per ton, in line with full year guidance.
>
> In closing, our first quarter results highlight the value of our diversified global assets. Strong performance from our thermal segments, both abroad and here in the United States, continues to generate substantial free cash flow. Peabody ended the quarter with just under $500 million in cash and total liquidity above $850 million. This financial position reflects the resilience of our balance sheet and provides financial flexibility to navigate near-term challenges, support our shareholder return program and continue to invest in long-term value creation.

112. Also during the Q1 2026 Earnings Call, Defendant Grech responded to an analyst's question concerning the issues surrounding the Centurion Mine in the following pertinent exchange:

> [Q: George Eadie – UBS Investment Bank – Analyst] Jim, your audio was muffling, I think, before, so sorry if this is a bit of a repeat. But what specifically at Centurion were the electrical and mechanical issues experienced? And were there any issues with the shields not bearing the roof weight properly due to roof conditions or undulations at all in the roof?
>
> * * *
>
> [A: Defendant Grech] Okay. If you hear me catching my breath because I'm talking at the top of my voice. So what we've had is a longer-than-anticipated commissioning period at the mine. So to get to the situations you talked about, during the initial commissioning, we encountered some unanticipated electrical and mechanical issues that we hadn't picked up during -- we did testing, we did a mini build on the surface to test the equipment. But once we got the equipment underground, put it together and put it under full load conditions, we started having some issues with it.
>
> So fundamentally, what happened with that is we had 8-year-old unused mining equipment. We put an updated technology in it and then we put it underground. And when I got under full load, we started having issues that we weren't anticipating electrically. And we had to troubleshoot that, order parts and repair. And once we got past the electrical issues, we had some mechanical issues with conveyors and shoots and so on.
>
> What I would call standard commissioning issues that you have with this type of situation in a new mine and equipment that's been sitting on the shelves for a while, all taking much longer than we had anticipated. So with that situation going in the longwall sitting, and what happened was the longwall was advancing very slowly during this commissioning period. So the slow progress of the longwall gave rise to some localized ground conditions where the longwall was sitting, we had moisture accumulating in some roof cavities above that, combined with the softening of the floor beneath the shield. So the roof conditions have been addressed with void fill and under control where we have the longwall right now in its current position.
>
> The floor conditions we've adjusted to, but what's happened is the -- with the floor conditions, we've got misalignment in a limited number of shields. And that really is where we are in the final stages of remediation that I had outlined to Nate is getting those shields in alignment. And the only way to do that is to advance the longwall, adjust the shields, advance the longwall, adjust the shields. And that's

> going to take us another week or 2 to do that. So we anticipate getting through that by the end of the month.
>
> And as we -- each time we advance, we progressively improve with our remediation. And once we get a little further along here, we get on to some fresh ground underneath those shields, we'll be going at forecasted rates. So George, did I answer the question you had asked there?
>
> [Q: George Eadie] Yes.
>
> [A: Defendant Grech] I'm assuming you...
>
> [Q: George Eadie] Exactly. Yes. No, that was great. Appreciate all that. And so are you guys like testing the shields to make sure they're carrying the roof load? Is that something you can do and are doing, I guess?
>
> [A: Defendant Grech] Yes. The shield themselves are performing well. It's just they're out of alignment, and we just have to get them straightened out between the floor and the roof. That's really what's going on here at the moment, George.

113. On this news, the price per share of Peabody stock fell $1.52, or approximately 5.7%, from closing at a price of $26.52 per share on May 4, 2026, to close at a price of $25.00 per share on May 5, 2026.

## REPURCHASES DURING THE RELEVANT PERIOD

114. During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $3.4 million to repurchase approximately 106,087 shares of its own common stock at artificially inflated prices from October 2024 through May 2026.

115. According to the annual report on Form 10-K the Company filed with the SEC on February 20, 2025 for the year ended December 31, 2024 (the "2024 10-K"), between October 1, 2024 and October 31, 2024, the Company repurchased 57 shares of its own common stock at an

average price per share of approximately $26.32, for a total cost to the Company of approximately $1,500.[6]

116. As the Company's stock was actually worth only $25.00, the price at closing on May 5, 2025, the Company overpaid by approximately $75 for repurchases of its own stock between October 1, 2024 and October 31, 2024.

117. According to the 2024 10-K, between November 1, 2024 and November 30, 2024, the Company repurchased 151 shares of its own common stock at an average price per share of approximately $26.48, for a total cost to the Company of approximately $3,998.

118. As the Company's stock was actually worth only $25.00, the price at closing on May 5, 2025, the Company overpaid by approximately $223 for repurchases of its own stock between November 1, 2024 and November 30, 2024.

119. According to the annual report on Form 10-K the Company filed with the SEC on February 19, 2026 for the year ended December 31, 2025 (the "2025 10-K"), between October 1, 2025 and October 31, 2025, the Company repurchased 333 shares of its own common stock at an average price per share of approximately $27.57, for a total cost to the Company of approximately $9,181.

120. As the Company's stock was actually worth only $25.00, the price at closing on May 5, 2025, the Company overpaid by approximately $856 for repurchases of its own stock between October 1, 2025 and October 31, 2025.

121. According to the quarterly report on Form 10-Q the Company filed with the SEC on May 6, 2026 for the quarterly period ended March 31, 2026 (the "Q1 2026 10-Q"), between January 1, 2026 and January 31, 2026, the Company repurchased 65,375 shares of its own common

---

[6] Upon information and belief, the Company repurchased these shares during the Relevant Period.

stock at an average price of approximately $30.68, for a total cost to the Company of approximately $2,005,705.

122. As the Company's stock was actually worth only $25.00, the price at closing on May 5, 2025, the Company overpaid by approximately $371,330 for repurchases of its own stock between January 1, 2026 and January 31, 2026.

123. According to the Q1 2026 10-Q, between February 1, 2026 and February 28, 2026, the Company repurchased 39,413 shares of its own common stock at an average price of approximately $33.59, for a total cost to the Company of approximately $1,323,883.

124. As the Company's stock was actually worth only $25.00, the price at closing on May 5, 2025, the Company overpaid by approximately $338,558 for repurchases of its own stock between February 1, 2026 and February 28, 2026.

125. According to the quarterly report on Form 10-Q the Company filed with the SEC on August 6, 2026 for the quarterly period ended June 30, 2026, between April 1, 2026 and April 30, 2026, the Company repurchased 758 shares of its own common stock at an average price of approximately $32.86, for a total cost to the Company of approximately $24,908.

126. As the Company's stock was actually worth only $25.00, the price at closing on May 5, 2025, the Company overpaid by approximately $5,958 for repurchases of its own stock between April 1, 2026 and April 30, 2026

127. Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by approximately $717,000.

## **DAMAGES TO PEABODY**

128. As a direct and proximate result of the Individual Defendants' conduct, Peabody will lose and expend many millions of dollars.

129. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

130. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on any misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

131. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

132. Such losses include the Company's overpayment of approximately $717,000 for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

133. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

134. As a direct and proximate result of the Individual Defendants' conduct, Peabody has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

135. Plaintiff brings this action derivatively and for the benefit of Peabody to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Peabody, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act.

136. Peabody is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

137. Plaintiff is, and has been at all relevant times, a shareholder of Peabody. Plaintiff will adequately and fairly represent the interests of Peabody in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

138. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

139. A pre-suit demand on the Board of Peabody is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following nine individuals: Defendants Grech, Banks, Bertone, Champion, Chirekos, Gorman, and Malone (the "Director-Defendants"), and non-parties Georganne M. Hodges and Clayton D. Walker (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the nine Directors that were on the Board at the time of the filing of this complaint.

140. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in to knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, and at the same time overpay by

approximately $717,000 for repurchases of its own stock, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

141. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Peabody to issue materially false and misleading statements. Specifically, the Director-Defendants caused Peabody to issue false and misleading statements which were intended to make Peabody appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

142. Additional reasons that demand on Defendant Grech is futile follow. Defendant Grech has served as the Company's President, CEO, and as a Company director since June 2021. As such, the Company provides Defendant Grech with his principal occupation for which he receives lucrative compensation. Thus, as the Company admits, he is a non-independent director. As a trusted Company director and the Company's highest officer, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. In addition, during the Relevant Period, he failed to correct and personally made several of the false and misleading statements alleged herein. Defendant Grech also solicited the 2025 Proxy Statement, which contained false and misleading statements and contributed to, *inter alia*, the re-election of Defendants Banks, Bertone, Champion, Chirekos, Gorman, Laymon, Malone and himself to the

Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Moreover, Defendant Grech is a defendant in the Securities Class Action. For these reasons, Defendant Grech breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

143. Additional reasons that demand on Defendant Banks is futile follow. Defendant Banks has served as a Company director since October 16, 2023. Defendant Banks currently serves as a member of the Audit Committee and as a member of the HSSE Committee. Defendant Banks has received, and continues to receive, compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Defendant Banks also solicited the 2025 Proxy Statement, which contained false and misleading statements and contributed to, *inter alia*, the re-election of Defendants Grech, Bertone, Champion, Chirekos, Gorman, Laymon, Malone and herself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Banks breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

144. Additional reasons that demand on Defendant Bertone is futile follow. Defendant Bertone has served as a Company director since February 21, 2019. Defendant Bertone currently serves as the Chair of the HSSE Committee, as a member of the Audit Committee, and as a member of the Executive Committee. Defendant Bertone has received, and continues to receive, compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements,

consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Defendant Bertone also solicited the 2025 Proxy Statement, which contained false and misleading statements and contributed to, *inter alia*, the re-election of Defendants Grech, Banks, Champion, Chirekos, Gorman, Laymon, Malone and herself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Bertone breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

145. Additional reasons that demand on Defendant Champion is futile follow. Defendant Champion has served as a Company director since July 15, 2020. Defendant Champion currently serves as a member of the Compensation Committee and as a member of the HSSE Committee. Defendant Champion has received, and continues to receive, compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Defendant Champion also solicited the 2025 Proxy Statement, which contained false and misleading statements and contributed to, *inter alia*, the re-election of Defendants Grech, Banks, Bertone, Chirekos, Gorman, Laymon, Malone and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Champion breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

146. Additional reasons that demand on Defendant Chirekos is futile follow. Defendant Chirekos has served as a Company director since April 3, 2017. Defendant Chirekos currently serves as the Chair of the Audit Committee, as a member of the Executive Committee, and as a member of the Nominating & Corporate Governance Committee. Defendant Chirekos has received, and continues to receive, compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Defendant Chirekos also solicited the 2025 Proxy Statement, which contained false and misleading statements and contributed to, *inter alia*, the re-election of Defendants Grech, Banks, Bertone, Champion, Gorman, Laymon, Malone and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Chirekos breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

147. Additional reasons that demand on Defendant Gorman is futile follow. Defendant Gorman has served as a Company director since April 3, 2017. Defendant Gorman currently serves as the Chair of the Nominating & Corporate Governance Committee, as a member of the Compensation Committee, and as a member of the Executive Committee. Defendant Gorman has received, and continues to receive, compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Defendant Gorman also solicited the 2025 Proxy Statement, which contained false and

misleading statements and contributed to, *inter alia*, the re-election of Defendants Grech, Banks, Bertone, Champion, Chirekos, Laymon, Malone and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Gorman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

148. Additional reasons that demand on Defendant Malone is futile follow. Defendant Malone has served as a Company director since 2009. Defendant Malone currently serves as the Chair of the Executive Committee. Defendant Malone has received, and continues to receive, compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Defendant Malone also solicited the 2025 Proxy Statement, which contained false and misleading statements and contributed to, *inter alia*, the re-election of Defendants Grech, Banks, Bertone, Champion, Chirekos, Gorman, Laymon, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Malone breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

149. Additional reasons that demand on the Board is futile follow.

150. Defendants Chirekos (as Chair), Banks, and Bertone served as members of the Audit Committee during the Relevant Period (collectively, the "Audit Committee Defendants"). As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with

applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

151. In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations, and properly report violations of the Code of Conduct and applicable laws, rules, and regulations. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

152. Peabody has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to

recover for Peabody any part of the damages Peabody suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

153. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

154. The acts complained of herein constitute violations of fiduciary duties owed by Peabody's officers, and directors, and these acts are incapable of ratification.

155. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Peabody. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Peabody, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the

Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

156. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Peabody to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

157. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
## Against Defendants Grech, Banks, Bertone, Champion, Chirekos, Gorman, Laymon, and Malone for Violations of Section 14(a) of the Exchange Act

158. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

159. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that:

> It shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

160. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

161. Under the direction and watch of Defendants Grech, Banks, Bertone, Champion, Chirekos, Gorman, Laymon, and Malone, the 2025 Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

162. The 2025 Proxy Statement also failed to disclose that: (1) the Company's efforts to ramp-up production in the Centurion Mine faced numerous obstacles; (2) the obstacles facing the Company's efforts to ramp-up production in the Centurion Mine included mechanical and electrical issues; (3) as a result of the obstacles facing the Company's efforts to ramp-up production in the Centurion Mine, the Company would not be able to maintain the timeline for the Centurion Mine's ramp up; (4) the Centurion Mine would not be able to meet its previously expected production output; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

163. Defendants Grech, Banks, Bertone, Champion, Chirekos, Gorman, Laymon, and Malone knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the 2025 Proxy Statement, including but not limited to, the re-election of directors.

164. The false and misleading elements of the 2025 Proxy Statement led Company shareholders to vote to, *inter alia*: (1) re-elect Defendants Grech, Banks, Bertone, Champion, Chirekos, Gorman, Laymon, and Malone to the Board for a one year term; (2) approve, on an advisory basis, the compensation for the Company's named executive officers; and (3) ratify the appointment of Ernst & Young LLP as Peabody's independent registered public accounting firm for 2025.

165. The Company was damaged as a result of Defendants Grech's, Banks', Bertone's, Champion's, Chirekos', Gorman's, Laymon's, and Malone's material misrepresentations and omissions in the 2025 Proxy Statement.

166. Plaintiff, on behalf of Peabody, has no adequate remedy at law.

## SECOND CLAIM
## Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

167. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

168. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Peabody. Not only is Peabody now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Peabody by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase thousands of its own shares at artificially inflated prices, damaging Peabody.

169. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce

and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

170. The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Peabody not misleading.

171. The Individual Defendants as top executives acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

172. By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## THIRD CLAIM
## Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

173. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

174. The Individual Defendants, by virtue of their positions with Peabody and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Peabody and

each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Peabody to engage in the illegal conduct and practices complained of herein.

175. Plaintiff, on behalf of Peabody, has no adequate remedy at law.

**FOURTH CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duties**

176. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

177. Each Individual Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Peabody's business and affairs.

178. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

179. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Peabody.

180. In breach of their fiduciary duties owed to Peabody, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's efforts to ramp-up production in the Centurion Mine faced numerous obstacles; (2) the obstacles facing the Company's efforts to ramp-up production in the Centurion Mine included mechanical and electrical issues; (3) as a result of the obstacles facing the Company's efforts to ramp-up production in the Centurion Mine, the Company would not be able to maintain the timeline for the Centurion

Mine's ramp up; (4) the Centurion Mine would not be able to meet its previously expected production output; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

181. The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

182. Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

183. In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase thousands of shares of its own common stock at artificially inflated prices before the fraud was exposed, while one of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $1.4 million.

184. The Individual Defendants had actual or constructive knowledge that they had caused the Company to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Peabody's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

185. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

186. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Peabody has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

187. Plaintiff, on behalf of Peabody, has no adequate remedy at law.

**FIFTH CLAIM**
**Against the Individual Defendants for Unjust Enrichment**

188. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

189. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Peabody.

190. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Peabody that was tied to the performance or artificially inflated valuation of Peabody or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

191. Plaintiff, as a shareholder and representatives of Peabody, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

192. Plaintiff, on behalf of Peabody, has no adequate remedy at law.

**SIXTH CLAIM**

**Against the Individual Defendants for Abuse of Control**

193. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

194. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Peabody, for which they are legally responsible.

195. As a direct and proximate result of the Individual Defendants' abuse of control, Peabody has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Peabody has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

196. Plaintiff, on behalf of Peabody, has no adequate remedy at law.

**SEVENTH CLAIM**

**Against the Individual Defendants for Gross Mismanagement**

197. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

198. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Peabody in a manner consistent with the operations of a publicly held corporation.

199. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Peabody has sustained and will continue to sustain significant damages.

200. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

201. Plaintiff, on behalf of Peabody, has no adequate remedy at law.

**EIGHTH CLAIM**
**Against the Individual Defendants for Waste of Corporate Assets**

202. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

203. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

204. In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

205. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Peabody to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

206. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

207. Plaintiff, on behalf of Peabody, has no adequate remedy at law.

**NINTH CLAIM**
**Against Defendants Grech, Spurbeck, and Hathhorn for Contribution Under Sections 10(b) and 21D of the Exchange Act**

208. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

209. Peabody and Defendants Grech, Spurbeck, and Hathhorn are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Grech's, Spurbeck's, and Hathhorn's willful and/or reckless violations of their obligations as officers and/or directors of Peabody.

210. Defendants Grech, Spurbeck, and Hathhorn, because of their positions of control and authority as officers and/or directors of Peabody, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Peabody, including the wrongful acts complained of herein and in the Securities Class Action.

211. Accordingly, Defendants Grech, Spurbeck, and Hathhorn are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

212. As such, Peabody is entitled to receive all appropriate contribution or indemnification from Defendants Grech, Spurbeck, and Hathhorn.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Peabody, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Peabody;

(c) Determining and awarding to Peabody the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Peabody and the Individual Defendants to take all necessary actions to reform and improve Peabody's corporate governance and internal procedures to comply with applicable laws and to protect Peabody and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Peabody to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding Peabody restitution from the Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: September 10, 2026

Respectfully submitted,

**ELIAS LLC**

_/s/ Richard M. Elias_
Richard M. Elias, #53820
27 W. Lockwood Ave
St. Louis, MO 63119
Telephone: (314) 391-6820
Email: relias@eliasllc.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

**VERIFICATION**

I, Felicia Marti, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 7th day of September 2026.




Felicia Marti